UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| BENJAMIN D. SIMMONS, ) | CASE NO. 1:08 CV 0513 |
| ) | |
| Plaintiff, ) | JUDGE DONALD C. NUGENT |
| ) | |
| v. ) | MEMORANDUM OF OPINION |
| ) | AND ORDER |
| A.I.M.C.O. Property Management, et al., ) | |
| ) | |
| Defendants. ) | |

Pro se plaintiff Benjamin D. Simmons filed the above-captioned in forma pauperis action on February 28, 2008 against defendants A.I.M.C.O. Property Management and Whiteguard Security. Mr. Simmons alleges harassment, retaliation and discrimination based on race and religion in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e. He does set forth a claim for relief.

*Background*

Relevant facts recited in the complaint are, at times, confusing and contradictory. It is clear Mr. Simmons, who is African American and a practicing "voodooist," was hired as a

maintenance technician at South Park Apartments, a subsidiary of A.I.M.C.O. and Whiteguard Security. During a "R.E.A.T. inspection" in May 2006, he engaged in a "verbal confrontation" with the Regional Manager, Chris Deer. The dispute stemmed from Mr. Simmons's objections to the manner in which Mr. Deer treated residents and fellow employees. Mr. Deer advised another A.I.M.C.O. employee, Brenda Welker, that he sent Mr. Simmons home "for neglect of duty." Mr. Simmons calls this "a false statement." Before the incident with Mr. Deer, plaintiff claims he "had an excellent two year work history w/A.I.M.C.O."

Mr. Simmons alleges he was treated with less respect after his incident with the Regional Manager. Although his manager Martha Price's "condescending remarks were generally considered as, 'Being Ms. Marty' and were normally overlooked," she allegedly began to single out the plaintiff. For example, she would adjust his time sheet to eliminate over-time opportunities or fail to distribute work orders evenly. On a personal level, she spoke to him in a degrading manner.

The first Performance Improvement Plan (PIP) he ever received was issued by Ms. Price on June 20, 2006. She claimed Mr. Simmons did not complete work in a timely manner and wasted too much time when he worked on a vacant unit. While he claims he was initially advised by another employee not to sign the order, a signed copy and a plan to address his Performance and Competency Gaps was included with the complaint. The PIP indicates that Mr. Simmons's progress would be checked every week beginning July 1, 2006 and that his work orders would be monitored.

Three months after the incident with Regional Manager Deer, Mr. Simmons again complained about Mr. Deer to Sue Whitmore in A.I.M.C.O.,'s Human Resources department. While he also mentioned Ms. Price's treatment of him, he does not allege he filed a complaint against her. Instead he asked to be transferred, as he felt his job was being threatened. Some time thereafter, Mr.

Deer was fired "for unknown reasons."

During the entire time Mr. Simmons claims he was treated rudely by Ms. Price, she allowed him to arrive at work at 8:30 a.m. and take a 30 minute lunch to accommodate his religious beliefs. His school schedule was accommodated by allowing him to take the last lunch schedule and leave by 4:30 p.m. Moreover, another employee would be on call during the days Mr. Simmons was in school and he would be on-call on the weekends because of staff shortages. (Compl. at 6.) Finally, his dietary needs were accommodated by the fact that his employer "offered me accommodations to my vegetarian diet during business trips, luncheons, and team projects." (Compl. at 6.) On the one occasion he could not be accommodated, he was permitted to go home and prepare his own food.

At some point Ms. Price no longer worked with Mr. Simmons, and she was replaced by Pat Yeagley. On October 31, 2006, Ms. Yeagley questioned why Mr. Simmons came to work at 8:30 a.m. when everyone else arrived at 8:00 a.m. He advised her that the previous manager permitted him to adjust his schedule for religious reasons. While employees who arrived at 8:00 a.m. were permitted to take one hour for lunch, Mr. Simmons was permitted to arrive at 8:30 a.m. to accommodate his prayer schedule and it was "agreed I would take lunch at 4:30 to accommodate my school schedule." (Compl. at 3.) He states "I worked the whole day from 8:30 - 4:30, which she stated was not a problem. Mean while [sic] being on call during the weekend." (Compl. at 3.)

Mr. Simmons "assumed acting supervisor after Mr. Leroy was terminated in November [2006?] b/c I was most qualified. There was no need for me to inquire about the supervisor position; I was the only maintenance tech and feel I was rightfully entitled." (Compl. at 6.) There is no indication he actually applied for the position of supervisor or that A.I.M.C.O.

3

acknowledged his role as "acting supervisor."

On December 19, 2006, Simmons complained to Ms. Whitmore in Human Resources about Ms. Yeagley. He claims she "intimidated, victimized and singled [him] out on many occasions." (Compl. at 3.) It appears Mr. Simmons took issue with the fact that a former temporary worker, George Ramos, would be his new service manager. Mr. Simmons protested that he was entitled to the position with a 98% score on A.I.M.C.O.'s Maintenance Skills test and one year of "hands on" experience. Ms. Yeagley countered that Mr. Ramos had more qualifications than Mr. Simmons, a fact the plaintiff disputes. After attempting to contact Ms. Whitmore again on December 24, 2006, Mr. Simmons went on vacation from December 26, 2006 until January 5, 2007.

Upon return from vacation, Mr. Simmons was asked to turn in his keys. He was advised that "another investigation was going on and I would be receiving my keys back when it was over. I was placed on six months Job Performance Evaluation based on a previous write up which I rejected by a former Community Manager Martha Price." (Compl. at 3-4.) Mr. Simmons admits he left his keys at another property "20 minutes away [but] [t]he keys were at no risk at [sic] being found by another tenant." (Compl. at 4.) Ms. Yeagley advised him that she had learned that he complained about her to Ms. Whitmore and was "upset after she was trying to help me by defending me against Ms. Price and Ms. Welker." (Compl. at 4.) For reasons he does not explain in the complaint, Mr. Simmons filed an E.E.O.C. charge against Ms. Yeagley on January 9, 2007, after failing to receive a response from Ms. Whitmore.

On or about January 9, 2007, Mr. Simmons attempted to respond to an emergency service order from "Mr. Ed." When he tried to retrieve his keys from the office, a security guard intercepted him and explained Ms. Yeagley did not want him in the office. Moments later she met

Mr. Simmons at the unit from where the service call originated. Ms. Yeagley explained to Mr. Simmons that he could leave and that Mr. Ed would handle the order the following morning. When he asked if he was fired, Ms. Yeagley replied "she didn't have the power to terminate me but if she did I would be gone by now." (Compl. at 4.)

Mr. Simmons advised Ms. Yeagley on January 19, 2007 that he "would be doing some piece rituals and that it would take seven days. I explained that some of my rituals would require my [sic] not to speak and if she could inform the security guards, so there wouldn't be any miss communication [sic]." (Compl. at 4.) He does not disclose whether Ms. Yeagley refused or ignored his request.

When Mr. Simmons returned from a poetry performance at 1:20 a.m. on January 22, 2007, he "explained to the security guards that I may be coming back to start my prayer ritual and that I wasn't permitted to speak so when they see me. My prayers had nothing to do with entering the office; neither did my conversation with security." (Compl. at 4.) Instead of starting his prayers, Mr. Simmons explains he opted to go straight home because it was late and his daughter was sleeping. The following day, however, Ms. Yeagley confronted Mr. Simmons to ask why he was in the office the night before. The security guards advised her that he approached them around one o'clock in the morning to request the keys so he could "do some cleaning." They added that the plaintiff appeared drunk. Mr. Simmons called the accusation "bogus," in part, because cleaning was not part of his job description; plus, Ms. Yeagley knew he was spending time with his daughter that weekend and he was not a drinker. Mr. Simmons believed the accusations were manufactured by Ms. Yeagley and Whitmore Security to "hinder my job performance." When he asked that the accusations be confirmed, Ms. Yeagley complied but the officers "failed to produce any evidence to prove a claim

5

against me." (Compl. at 5.)

On February 5, 2007, Mr. Simmons received a call from a tenant who complained he had no running water. Ms. Yeagley radioed Mr. Simmons to her office and advised him to "let Jorge know." When Mr. Simmons advised Jorge, he allegedly gave him permission to handle the situation and let him know the status the following day. The balance of activities that occurred after that day cannot be paraphrased. Simmons alleges:

> Later that day I requested the rest of the day off, b/c I found damage to be greater then expected. I requested the following day the Sixth off to make the same repairs to my other two properties. I also requested the seventh off which was my two year anniversary to make repairs. I would come into work on the eight [sic]. Mr. Ramos should [sic] concern for me the whole time and even called to check up on my progress. There wasn't any ill feeling at any time, on either behalf. It is a defamation of character, wrongful termination of employment and unprofessional business communication. For example some concerned security guards told me to watch my back, which I have, statement [sic]. Several tenants came to discuss my personal issues, such as info about my vehicle not being registered, and accusing me of smoking Marijuana and practicing voodoo.

(Compl. at 6.) Three days after receiving the service call, Mr. Simmons was terminated on February 8, 2007 for "insubordination." He subsequently filed charges with the E.E.O.C. and received a Notice of Right to Sue, dated November 29, 2007.

Mr. Simmons believes he was the victim of retaliation by Ms. Price and Ms. Yeagley and that A.I.M.C.O. was aware of what was going on. He claims that he was advised that the PIP was the only reason he was not being promoted. Moreover, Mr. Simmons complained he was being overworked and not properly compensated. He adds that after he was fired he was denied his right to a smaller unit apartment, denied a copy of his house and mail box keys and was not permitted to

6

bring his car on site even though it was registered.

*Standard of Review*

Although pro se pleadings are liberally construed, Boag v. MacDougall, 454 U.S. 364, 365 (1982) (per curiam); Haines v. Kerner, 404 U.S. 519, 520 (1972), the district court is required to dismiss an action under 28 U.S.C. §1915(e) if it fails to state a claim upon which relief can be granted, or if it lacks an arguable basis in law or fact.[1] Neitzke v. Williams, 490 U.S. 319 (1989); Lawler v. Marshall, 898 F.2d 1196 (6th Cir. 1990); Sistrunk v. City of Strongsville, 99 F.3d 194, 197 (6th Cir. 1996). For the reasons stated below, this action is dismissed pursuant to section 1915(e).

The Supreme Court has clarified that, at the pleading stage, a plaintiff is not required to allege facts to support a prima facie case of discrimination. Swierkiewicz v. Sorema, 534 U.S. 506 (2002)(employment discrimination complaint need not contain specific facts establishing a prima facie case under the McDonnell Douglas [v. Green, 411 U.S. 792 (1973)] framework). This holding did not, however, eliminate the basic tenets of notice pleading.

Rule 8 of the Federal Rules of Civil Procedure requires, in relevant part:

> (1) a short and plain statement of the grounds upon which the court's jurisdiction depends... (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

---

[1] A claim may be dismissed sua sponte, without prior notice to the plaintiff and without service of process on the defendant, if the court explicitly states that it is invoking section 1915(e) [formerly 28 U.S.C. § 1915(d)] and is dismissing the claim for one of the reasons set forth in the statute. McGore v. Wrigglesworth, 114 F.3d 601, 608-09 (6th Cir. 1997); Spruytte v. Walters, 753 F.2d 498, 500 (6th Cir. 1985), cert. denied, 474 U.S. 1054 (1986); Harris v. Johnson, 784 F.2d 222, 224 (6th Cir. 1986); Brooks v. Seiter, 779 F.2d 1177, 1179 (6th Cir. 1985).

FED. R. CIV. P. 8(a). Even under the liberal notice pleading requirements of Rule 8 and the liberal perspective in which pro se complaints are generally viewed, the complaint does not contain even the minimum requirements of a "short and plain statement" of a claim showing entitlement to relief. See FED. CIV. R. P. 8(a); Vector Research, Inc. v. Howard & Howard Attorneys P.C., 76 F.3d 692, 697 (6th Cir. 1996)("'Under the liberal federal system of notice pleading, all that a plaintiff must do in a complaint is give a defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'")(quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

*42 U.S.C. § 2000e*

Title VII's anti-retaliation provision states in pertinent part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e3 (a). A claim of retaliation is established when the plaintiff demonstrates that "(1) [he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir.2007). Title VII's opposition clause protects an employee "against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII." Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579 (6th Cir.), cert. denied, 531 U.S. 1052 (2000).

There is no question but that the filing of a charge of discrimination with the E.E.O.C.

8

is a protected activity and that employers must be prevented from interfering with such activity through the use of economic or emotional sanctions. East v. Romine, Inc., 518 F.2d 332 (5th Cir. 1975). The opposition clause, however, did not require that Mr. Simmons "engage in the formal process of adjudicating a discrimination claim." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 (4th Cir.1998). Rather it "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id.

Even at this low threshold, Mr. Simmons has failed to state a claim. The complaint alleges Mr. Simmons was treated poorly after he argued with the Regional Manager in May 2006. The question for the court on this issue is whether the plaintiff was discriminated against as a result of engaging in any protected activity. There is no allegation that the defendants retaliated against Mr. Simmons for opposing a protected activity. While Mr. Simmons claims he objected to Mr. Deer's treatment of residents and fellow employees, he does not allege Mr. Deer engaged in the unlawful treatment of these individuals. The complaint fails to state a single allegation that the defendants started to retaliate against Mr. Simmons after Mr. Deer engaged in any unlawful activity about which Mr. Simmons complained. By his own admission, Mr. Simmons filed his first E.E.O.C. complaint against Ms. Yeagley in January 2007, months after his altercation with Mr. Deer, who had since been fired, and well after he claims the "retaliatory" treatment started. If anything, his E.E.O.C. charge against Ms. Yeagley may have related to his claim of entitlement to the position of supervisor. And even on that issue, there is not a single allegation in the complaint that he was denied the promotion because of race or religion or that the person chosen for the position was not in a class protected by Title VII. With regard to his claims of discrimination based on religion he has simply failed to

demonstrate that the defendants refused to accommodate his needs.

Accordingly, plaintiff's Motion to Proceed In Forma Pauperis is granted and this action is dismissed under section 1915(e). The court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith.[2]

IT IS SO ORDERED

*/s/ Donald C. Nugent 4/21/08*
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

---

[2] 28 U.S.C. § 1915(a)(3) provides:

> An appeal may not be taken in forma pauperis if the trial court certifies that it is not taken in good faith.